UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        *Plaintiff,*

vs.                                                    Case No. 24-cr-50-JDP

STEVEN ANDEREGG,

        *Defendant.*

---

### MEMORANDUM IN SUPPORT OF BOND

---

Steven Anderegg, by counsel, files this brief in support of pretrial release. This court has the benefit of the pretrial services report and the government's brief, so this memorandum will focus in on what matters most under the Bail Reform Act and why conditions can be fashioned to ensure Anderegg's appearance at court and the community's safety.

The bail report provides a very good overview of Anderegg's life. He's from the La Crosse area—born there, raised there, went to school there, and has a loving family there. He's been successful in life working as a software engineer and through thrift and hard work has not only provided for his family but purchased investment properties. In a word, he has lived four decades of a pro-social life, and he has strong ties to his community—all of which show he's not a flight risk.

While common sense establishes as much, it's important to stress that upon his arrest in March, Anderegg and his counsel were told that his case would be charged

1

federally. Yet he was released on bond by the State and as everyone expected he abided by all his conditions of pretrial release—he even gained some greater liberties from his probation officer and the bond amount was reduced. Those conditions mirror what he'd have with federal supervision—house arrest and no access to a computer or smartphone.[1] And he did all of that while he was facing a twenty-five-year mandatory minimum charge from the state. It should go without saying that if a twenty-five-year mandatory minimum doesn't trigger an urge to flee, then it's unlikely the penalties outlined in the government's brief will.

Rather, the issue at the bond hearing will center on public protection. That is, short of detention are there *no* conditions that will reasonably assure the community's safety? Here, the defense submits there are three points to stress.

First, the bail report notes that Anderegg was investigated five years ago concerning child pornography and that he admitted being exposed to child pornography and that there were markers of known images of child pornography on his devices.[2] And given that the probation department doesn't have all the discovery, it's easy to miss the nuance of what allegedly happened in 2019. But it's worth clarifying what the evidence actually shows.

Law enforcement executed a search warrant and interviewed Anderegg. During the time, he gave this statement:

---

[1] R.14:2.
[2] R.14:5.

2

> 26. On April 28, 2020, agents with WI DOJ-DCI served a search warrant at Steven Anderegg's residence and collected numerous electronic items. During my interview with Anderegg, he admitted to using multiple peer-to-peer platforms to include Freenet. When asked about seeing CSAM online, ==Anderegg said "nothing really pops into my mind, but obviously there's lots that you can't really tell if they're 16, 19, or 20."== Anderegg stated he didn't knowingly download any CSAM that law enforcement observed being requested over the Freenet network and said he was surprised they all came from one IP address, since he often reset, or unplugged and re-plugged his modem. ==Anderegg also admitted he would typically uninstall Freenet after every use and re-install it when he wanted to use it again but did not admit at any point to intentionally searching for or downloading CSAM.==

Two things are worth stressing. Anderegg has autism and his answers to any question are always very literal and painfully exact.[3] In response to have you seen child pornography, he didn't say "yes!—that's all I'm interested in. I've seen and have lots of it." Instead, he said, maybe—"you can't really tell if they're 16, 19, or 20." That is not: "you got me, I look at child pornography all the time; I have a deep and abiding interest in children. Rather, it's: "I look online and there's lot of stuff and you can't know for sure that the person who says they are 19 is not actually 16." Those two statements are worlds apart and Anderegg's actual statement is the one that must be credited—not some nefarious paraphrase.

---

[3] R.14:4

The other point worth stressing is that after going through all his devices, the government found "two" alleged links that were supposed to go to known child pornography.[4] There is no evidence (or even allegation) that those were knowingly downloaded by him. They could have been among materials that he clicked on or downloaded with other searches. And these are not "known images" as the term is normally used—that is, the Vicki or Susan series that trigger this or that image being child pornography.[5] They just have file names that are highly suggestive. Here, again, is the actual screenshot from discovery that bears this out:

> 27. A full forensic exam was completed on Anderegg's devices seized during the search warrant. The examination uncovered two forensic artifacts labeled as "file:///Z:/11yo%20jacks%20off%20cums%20with%20sound.wmv" and "file:///Z:/NEW2009_9yboycum.wmv," both of which contain terms that I know are indicative of CSAM.

That is, going through all of his devices, the full examination revealed *two* (just two) forensic artifacts labels that suggest child pornography.

To be clear: this is not an instance where the events of 2019 show a longstanding entrenched interest in illegal images of children—as if he was found with a bounty of child porn, convicted, went into therapy, and is now back at it again. Instead, they demonstrate what many people argued about the Freenet protocols: innocent people

---

[4] R.14:5.
[5] *United States v. Griesbach,* 540 F.3d 654, 656 (7th Cir. 2008)

4

were accused of things they didn't do. To that end, Anderegg does not have a "longstanding" interest in child pornography. Rather, the only evidence of having an abiding interest in children are the allegations of him creating obscene material and those that underlie the La Crosse state case. And the question is whether given *those* allegations there are no combination of conditions that will reasonably assure the community's safety.

Second, if this was a case of a defendant with no criminal history and Anderegg's pro-social attributes possessing and distributing actual child pornography, the defendant would usually be released—not always, but usually. The concerns expressed in the charge and investigation are usually addressed with conditions—keep off the computer and stay on lock down. And in those cases, there are really two concerns: first, is the defendant's urge to view these images so great that it can't be controlled; and second, is the potential harm of being released so great that the risk can't be tolerated—*The Freakonomics* analysis.

To the first point, putting aside the defense team's myriad factual and legal defenses to the charges (they're coming), if Anderegg had an *uncontrollable* urge to create obscene images, then some evidence of that would have been found when Anderegg was on pretrial supervision by the state and then arrested by the feds. Yet, there was nothing. No violations, no allegations, and when he was arrested no evidence—whatsoever—that showed he had engaged in this or similar behavior or any behavior that violated his bond. Put differently, with the benefit of over two months on pretrial release, the evidence is that Anderegg will abide by the court's orders.

5

To the second point, *The Freakonomics* angle, the government's argument is often that the risk is too high—children are re-victimized every time the defendant would re-engage in this behavior. But that's not the case here. These are digital creations. They do not involve *real* children being victimized. While the First Amendment implications will be argued down the line, it's important to stress that the ordinary arguments for danger writ large don't transfer to this charge. Indeed, that's likely why this isn't a presumption case and the government carries the burden throughout.

All of that is to say, this is not a case where Anderegg's alleged obsession with child pornography is so great that he poses a specific and articulable risk to society—what the law demands.[6] Again, we are not talking about creating child pornography; we are talking about using AI to create obscene images. And, for that matter, the risk (and consequences) that attend to his release are not so great that conditions cannot be fashioned. Keep him off the computer and with a third-party custodian and the Court can be reasonably assured that no more potentially obscene materials are created, and the community will be safe.

On that last point, it's important to address a particular observation raised in the bail report—namely, that Anderegg could be near children and therefore a risk.[7] After combing through *all* his devices, there is nothing that backs up the claim that he would wander over to a school and somehow seduce or injure a child. I have done *a lot* of bond motions in this Court and usually when that's an issue there are *specific* children that the

---

[6] *United States v. Dominguez,* 783 F.2d 702, 706 (7th Cir. 1986).
[7] R.14:5.

Hurley Burish, S.C.

defendant has an interest in. There is, of course, a spectrum: the ones with a fascination of a particular minor and others who take *very* creepy photos of lots of kids across the street. Yet here, there is nothing like that. There is not one iota of proof that Anderegg falls anywhere near that camp of having a particular interest in a particular child or group of children. Thus, under the normal analysis, the risk of allowing him to be released on bond should militate towards release.

Third, there is nothing in Anderegg's background that suggests he would not take this seriously and walk the line with the probation office. He is in his early forties. He's never been in trouble before. He has held down steady (well-paying) jobs for decades and he has a family. That is, he has the maturity and incentive to take seriously the gravity of what's upon him. All of that speaks to someone who is neither a specific, nor general risk to society. Instead, he is the type of person who this court can be assured will walk the line.

And he has the incentive to walk the line beyond staying out on bond, so we can fight his case. Rather, he also needs to get medical treatment. As outlined in the pretrial services report, Anderegg has a rare medical condition where his body does not produce testosterone. Instead, for years (I believe four) has had to have injections. While in custody, the jail staff has (despite all of the marshal's best efforts) deemed that long-standing treatment as "not medically necessary." Yet Anderegg needs to continue that treatment—the effects upon his body and psyche are devastating.

Often times, this Court talks about the shock-and-awe of being charged federally and that the extreme unpleasantness of being in jail will assure a defendant abides by

7

every condition of his release. The person charged is too scared not to abide. I respectfully submit that when it comes to Anderegg, the shock and awe came with the state charges and his behavior reflected that. Now, the extreme hardship of being in jail and being deprived his treatments has multiplied that message. He has every incentive to fight this case, and this Court can be assured that he walk the line and stay out on bond while doing so.

That is what this Court is looking for: is it reasonably assured that with conditions in place, that he will walk the line. To that end, the defenses submits that the government's arguments don't undermine what Anderegg's history establishes: a prosocial life, rooted in Wisconsin, and one that shows he can and will abide by this Court's every order. That is the core argument for release—namely, the government cannot meet its burden and consistent with the Bail Reform Act he must be released pending trial.

One final point to note is that if the Court has misgivings about Anderegg's mother's place and the possibility of re-upping the lease, those can be resolved. The family has indicated that if the renewed permission was denied that they would rent a home in the middle of the country that was far away from everything where there would be no issues. The family is not looking to go through the rigmarole of renting a new house if that's not necessary—that is, the family is not looking for trouble. If permission to stay with his mom were denied, the family would make something work for the Court and probation office; the biggest thing for the family is getting him out of custody.

8

HURLEY BURISH, S.C.

Dated this 12th day of June, 2024.

>Respectfully submitted,
>
>STEVEN ANDEREGG., *Defendant*
>
>*Electronically signed by Joseph A. Bugni*
>Joseph A. Bugni
>*Wisconsin Bar No.* 1062514
>HURLEY BURISH, S.C.
>33 E. Main Street, Suite 400
>Madison, WI 53703
>(608) 257-0945
>jbugni@hurleyburish.com