IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA

        v.                               Case No. 24-CR-50-JDP

STEVEN ANDEREGG,

        Defendant.

_____

**GOVERNMENT'S OMNIBUS RESPONSE IN OPPOSITION TO
DEFENDANT'S PRE-TRIAL MOTIONS**

_____

The United States of America, by and through undersigned counsel, respectfully submits this response in opposition to defendant Steven Anderegg's motion to suppress (Dkt. 39), motion to dismiss counts 1 and 4 (Dkt. 40), motion to dismiss counts 2 and 3 (Dkt. 41), motion to compel the production of grand jury materials (Dkt. 42), motion for a bill of particulars (Dkt. 43), motion to suppress and for a *Franks* hearing (Dkt. 50), and motion to compel the government to provide copies of obscene material (Dkt. 51).[1]

The charges in this case are the culmination of years of conduct on the part of the defendant establishing that he has a sexual interest in minors and a willingness to act on that interest both online and in person. He first came to law enforcement's attention in 2019, when someone using his home's internet attempted to download files depicting

_____

[1] The defendant briefed the first motion to suppress, the motions to dismiss, the motion for *in camera* review of grand jury materials, and the motion for a bill of particulars in his omnibus brief (Dkt. 52). The defendant briefed his second motion to suppress and for a *Franks* hearing and his motion to compel the production of copies of the obscene material in separate documents (Dkts. 50 & 51).

prepubescent children engaged in sex acts. A few years later, he began sexually abusing a prepubescent child to whom he had access. And most recently, he used generative artificial intelligence ("GenAI") to create hyper-realistic images of prepubescent children lasciviously displaying their genitals and engaging in sex acts with adults. He even sent some of these images to a 15-year-old over Instagram after encouraging this minor to request customized content. And at the same time, he was chatting with other minors on Instagram about their sex lives and his sexual interest in prepubescent children. The defendant was finally arrested in 2024, after warrant-authorized searches of his Instagram account and home uncovered the scope of his criminal conduct.

Faced with four obscenity charges here and a prosecution in La Crosse County, the defendant now asks the Court to apply inapposite precedent on adult obscenity and usurp the jury's fact-finding role to dismiss all the charges against him. He also asks the Court to invade the presumptive secrecy of the grand jury in order to second-guess its probable cause finding, and to instruct the government to provide him copies of his virtual child pornography and a bill of particulars identifying which of the images that he possessed and produced are obscene. Finally, he seeks suppression of all evidence recovered from the searches of his Instagram account and home because he does not believe images of prepubescent minors lewdly displaying their erections to other children can be obscene, and he requests a *Franks* hearing because he disagrees with the warrants' descriptions of the images he distributed. His arguments are uniformly without merit and his motions should be denied. The government will, however, provide a bill of particulars as to Counts 1 and 4, though he is not entitled to one as a matter of law.

## FACTUAL BACKGROUND

This case began after law enforcement determined that the defendant sent GenAI images of prepubescent minors showing other young children their erections to a 15-year-old on Instagram. Law enforcement first learned about this in November 2023, after the National Center for Missing and Exploited Children ("NCMEC") provided two CyberTips related to a particular Instagram account.[2] The CyberTips advised that this account—later identified as the defendant's—sent two images of naked minors over Instagram direct messenger to a suspected minor in October 2023. The CyberTips included the two images, a review of which confirmed that they depicted prepubescent-looking boys lewdly displaying their large, erect penises to other prepubescent- and young-looking minors. The CyberTips also provided portions of the defendant's private chat with this minor; examples of his public posts, all of which were described as GenAI images of minors in their underwear or bondage gear; and examples of other accounts that he followed. One of these accounts had a profile that read: ".....great to meet on telegram and talk about young boy addiction !!"

After receiving these CyberTips, law enforcement obtained the contents of the defendant's Instagram account pursuant to a warrant. *See* Dkt. 52-1. A review of this material revealed that, in September 2023, the defendant posted an Instagram story consisting of a realistic GenAI image of minors in BDSM-themed leather gear and a link

---

[2] "NCMEC is a national clearinghouse that gathers information about missing and exploited children … and receives information from various [internet services providers] through the Cyber Tip Line." *United States v. Prideaux-Wentz*, 543 F.3d 954, 956 (7th Cir. 2008).

with a message encouraging others to "[c]ome check out what [they] are missing" on Telegram, which is an encrypted mobile-messaging application. Law enforcement also identified numerous direct-message conversations that the defendant had with self-identified minors. In one conversation, the defendant had a lengthy exchange with a 15-year-old about the minor's "hot" sex life and said that he had not "been with" any "prepubescent" boys since his "younger days" but "like[d] looking" at them. Later, the defendant lamented that he could not "go around asking boys if they are into older guys," and asked this minor "wtf are they putting in the water these days making yalls disks so long? … Stupid autocorrect." He then said "I've always liked them bites size too myself," referring to children's penises, and asked to see the minor's bedroom. In a different conversation, the defendant discussed with a 16-year-old how "hot" the minors in the defendant's GenAI images were and told this 16-year-old that he was "damb cute[.]" And in yet another conversation, an individual sent the defendant videos of a pubescent male masturbating, to which the defendant responded "[t]hanks, I guess?" and, to keep the conversation going, asked "You go around sending such vids to everyone?" One user even confronted the defendant about his images of "[l]ittle boys in their underwear," telling him that his interest in these images is "literally pedophilea" and asking why he does "not just show everything" in the images since the minors are "already half naked." In response, the defendant says "[c]uz that would be illeagal stupid."

Law enforcement also located the defendant's direct-message conversation with the suspected minor that was reported in the CyberTips. A review of this conversation confirmed that, in response to questioning from the defendant, the other user advised

that he was only 15 years old, which law enforcement has since verified was true. The defendant then explained to the minor how he creates GenAI images by inputting text prompts in a text-to-image GenAI model called Stable Diffusion, which generates images based on his parameters. After asking if the minor would like any customized GenAI images, the defendant sent a series of realistic images of minimally clothed minor boys, including three images that depict prepubescent boys graphically displaying their erect penises. *See* Dkt. 52-2 at 40-41, 45-46 (residential warrant describing these images).

Based on information provided by Instagram, law enforcement linked the account reported in the CyberTips to an internet account under the defendant's name at his home in Holmen, Wisconsin. But this was not the first time that the defendant's internet account had been flagged during a child-exploitation investigation. Roughly four years prior, law enforcement had observed that someone using the internet at his home was requesting to download multiple files of known child sexual abuse material over an online peer-to-peer network. Law enforcement searched the defendant's home in furtherance of this prior investigation in 2020, during which the defendant admitted to using and deleting the specific peer-to-peer network. A forensic examination of devices seized from the defendant during the search uncovered evidence that they had been used to download files that appeared to be associated with minor boys over this peer-to-peer network. Law enforcement also identified forensic artifacts related to two files with the following titles: "11 yo jacks off cums with sound.wmv" and "NEW2009_9yboycum.wmv."

Based on the above, law enforcement obtained and executed a warrant to search the defendant's home in February 2024. The defendant voluntarily agreed to speak with

law enforcement and admitted to being familiar with Stable Diffusion before ending the interview. Law enforcement located his work computer for his job as a software engineer[3] and seized his personal laptop and two cell phones, among other items. A review of these devices uncovered evidence linking the defendant to the Instagram account reported to NCMEC, including evidence indicating that he accessed the account from his cell phone. The review further confirmed that the defendant installed Stable Diffusion on his personal laptop, along with a graphical user interface and add-ons that specialized in producing images of genitalia, and then used these tools to generate photorealistic images of minors. He had on this laptop over 13,000 GenAI images, many of which depict nude or semi-clothed prepubescent minors lasciviously displaying or touching their genitals. Still others depict prepubescent minors touching what appear to be adult penises or engaging in sexual intercourse. Additional evidence from the laptop indicates that he used specific and explicit text prompts—"two cute nine year old gay emo boys enjoying a enormous throbbing penis," for example—to create these images. He likewise used specific "negative" prompts—text prompts that direct the GenAI model on what not to generate—to avoid creating images of adults.

Following the search of his home, the defendant was charged in La Crosse County Circuit Court with exposing a child to harmful material, in violation of Wis. Stat. §

---

[3] A copy of the defendant's CV indicates that he has worked as a software engineer since 2003 and studied computer science in college. His CV also lists a recent job at a startup in which he "[u]tilize[d his] excellent technical understanding in formulating AI models" to develop the company's infrastructure.

948.11(2)(a), and first-degree sexual assault of a child under the age of thirteen, in violation of Wis. Stat. § 948.02(1)(e). *See* Dkt. 60-1. On May 15, 2024, a federal grand jury in the Western District of Wisconsin returned a four-count indictment charging him with producing obscene visual representations of the sexual abuse of children, in violation of 18 U.S.C. § 1466A(a)(1); distributing obscene visual representations of the sexual abuse of children, in violation of 18 U.S.C. § 1466A(a)(1); transferring obscene material to a minor, in violation of 18 U.S.C. § 1470; and possessing obscene visual representations of the sexual abuse of children, in violation of 18 U.S.C. § 1466A(b)(1). *See* Dkt. 2.

## ARGUMENT

## I.    Legal Background on Child Pornography and Obscenity

"Child pornography"—*e.g.*, images of actual children engaged in sexually explicit conduct—is categorically unprotected speech, and the First Amendment therefore does not bar the government from criminalizing its production, distribution, sale, or possession. *See Osborne v. Ohio*, 495 U.S. 103 (1990); *New York v. Ferber*, 458 U.S. 747 (1982). "Obscene" material is also categorically unprotected speech. *See, e.g., United States v. Williams*, 553 U.S. 285, 288 (2008). Material is "obscene" if it "appeals to the prurient interest, is patently offensive in light of community standards, and lacks serious literary, artistic, political, or scientific value." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 246 (2002) (citing *Miller v. California*, 413 U.S. 15, 24 (1973)).

In *Ashcroft v. Free Speech Coalition*, the Supreme Court held that the definition of "child pornography" then set forth in 18 U.S.C. § 2256(8)(B)—which included materials that are, or that appear to be, of a minor engaging in sexually explicit conduct—violated

the First Amendment because (i) it did not require proof that the image showed an actual minor, and (ii) it did not require proof that the image was obscene. *See generally Free Speech Coalition*, 535 U.S. at 245-256. The next year, in response to *Free Speech Coalition*, Congress enacted the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today (PROTECT) Act, Pub. L. 108-21, 117 Stat. 650 (2003) (effective Apr. 30, 2003). The PROTECT Act created a new statute, 18 U.S.C. § 1466A, which, as relevant here, makes it a crime to produce, distribute, or possess "a visual depiction of any kind … that (1)(A) depicts a minor engaging in sexually explicit conduct; and (B) is obscene." 18 U.S.C. § 1466A(a)(1), (b)(1); *see id.* § 1466A(f)(2) (defining "sexually explicit conduct" by cross-referencing 18 U.S.C. § 2256(2)(A) or (B)). Section 1466A(c) further provides that "[i]t is not a required element of any offense under this section that the minor depicted actually exist." Because § 1466A requires proof of obscenity, the statute presents no First Amendment problem under *Free Speech Coalition*. *See generally United States v. Arthur*, 51 F.4th 560, 568-569 (5th Cir. 2022).

## II.    The Defendant's Motion to Dismiss Counts 1 and 4 Should Be Denied.

Relying on *Stanley v. Georgia*, 394 U.S. 557 (1969), the defendant brings an as-applied challenge to § 1466A's proscription on producing and possessing obscene images of minors, arguing that application of the statute to him violates his First Amendment rights because he engaged in the underlying conduct in his home. Dkt. 52 at 39-43. As we understand it, the defendant argues that *Stanley* protects his in-home right to possess (or produce) obscene materials of all kinds—regardless of whether the imagery shows actual or virtual children. *See, e.g., id.* at 20 ("[W]hat happens within the four walls of a person's

home (with obscene materials) is off-limits from government control. … [S]o long as you're inside the home, the First Amendment provides you absolute protection."); *id.* at 21 ("Within the home a person is free to do as they will with obscene materials … ."); *id.* at 42 ("The legitimate sweep of § 1466A simply does not cover private possession and production of obscene materials within the home."). His argument is unavailing.

### A.    *Stanley v. Georgia*

In *Stanley*, the defendant was convicted of knowingly possessing obscene material—films of adults engaging in sexual activity—in a drawer in his bedroom, in violation of Georgia law. *Stanley*, 394 U.S. at 558-559; *see Stanley v. State*, 224 Ga. 259, 259 (Ga. 1968) (describing the films as showing "nude men and women engaged in acts of sexual intercourse and sodomy"). While recognizing that "obscenity is not protected by the First Amendment," the Supreme Court reversed the conviction, holding that the First Amendment right to "receive information and ideas" allows for the possession of obscene material solely within the privacy of one's home. *Stanley*, 394 U.S. at 560, 564-568; *see also United States v. 12 200-Foot Reels of Super 8mm. Film*, 413 U.S. 123, 126 (1973) ("*Stanley* depended, not on any First Amendment right to purchase or possess obscene materials, but on the right to privacy in the home.").[4]

The decision in *Stanley* was animated by the "weak interests asserted by" Georgia—that the state needed "to proscribe the private possession of obscenity because

---

[4] Although the parties dispute the scope of the right protected in *Stanley*, the parties agree that whatever its outer reach, *Stanley* only protects conduct undertaken in the home. *See, e.g.*, Dkt. 52 at 3-4, 20-21, 39-40.

it was concerned that [it] would poison the mind of its viewers"—which the Court found inconsistent with the First Amendment. *See Osborne*, 495 U.S. at 109-110; *see also Stanley*, 394 U.S. at 565-566 (rejecting Georgia's argument that "the State has the right to control the moral content of a person's thoughts"). The Court also rejected Georgia's fallback arguments that "exposure to obscene materials may lead to deviant sexual behavior or crimes of sexual violence" and that criminalizing the possession of obscenity "is a necessary incident to statutory schemes prohibiting distribution." *Id.* at 566-567. As to the first of these, the Court suggested that preventing additional criminal conduct was better addressed through "education and punishment," noting that there was no danger there that the "obscene material might fall into the hands of children" or the public. *Ibid.* And as to the second, the Court explained that restricting an individual's "right to read or observe what he pleases … may not be justified by the need to ease the administration of otherwise valid criminal laws." *Id.* at 568.

### B.    *Stanley* affords the defendant no aid.

#### a.    The Supreme Court has interpreted *Stanley* exceedingly narrowly.

Since *Stanley*, the Supreme Court has made clear that its holding was "narrow."[5] *Osborne*, 495 U.S. at 108. The Court has repeatedly declined to extend *Stanley* even one

---

[5] The Supreme Court has also made clear that constitutional questions of the type at issue in *Stanley* are better addressed through an historically focused framework. *See Kerry v. Din*, 576 U.S. 86, 93 (2015) ("[B]efore conferring constitutional status upon a previously unrecognized liberty, we have required a careful description of the asserted fundamental liberty interest, as well as a demonstration that the interest is objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if it was sacrificed." (Scalia, J.) (internal

step past the in-home possession of obscenity, regardless of whether that step is taken to privately view such material. *See United States v. Reidel*, 402 U.S. 351, 355 (1971) ("Whatever the scope of the 'right to receive' referred to in *Stanley*, it is not so broad as to immunize the [mailing of obscenity]."); *United States v. Orito*, 413 U.S. 139, 143 (1973) (finding no right to transport obscenity, even when it "is intended for the private use of the transporter"). And the Court has likewise declined to read *Stanley* as establishing a First Amendment right to possess other types of illicit material in one's home, including child pornography. *Osborne*, 495 U.S. at 107-111.

Not only is a narrow and fact-bound reading of *Stanley* thus compelled by the Supreme Court's later decisions, but it is also consistent with the Court's long-standing precedent cautioning that its opinions should be read in the context in which the case was presented. In *Cohens v. Virginia*, 19 U.S. (6 Wheat) 264 (1821), for example, Chief Justice Marshall explained that "[i]t is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressed are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." *Id.* at 399. The reason for this is "obvious": "The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate

---

quotation marks and brackets omitted)); *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 578 (2014) (applying the "history and tradition" analysis in the First Amendment context). Given that "there is sufficiently contemporaneous evidence to show that obscenity … was outside the protection intended for speech and press" at the "time of the adoption of the First Amendment," *see Roth v. United States*, 354 U.S. 476, 483 (1957), it is doubtful that the same outcome would be reached if *Stanley* were decided today.

it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated." *Id.* at 399-400. The Court made the same general point again in 1944. *See Armour & Co. v. Wantock*, 323 U.S. 126, 132-133 (1944) (cautioning that the "words of [the Court's] opinions are to be read in the light of the facts of the case under discussion," and that "[t]o keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court"). And in 2023, the Court offered similar direction, noting that it "has often admonished that 'general language in judicial opinions' should be read 'as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering.'" *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023) (quoting *Illinois v. Lidster*, 540 U.S. 419, 424 (2004)).

      b.    <u>*Stanley* does not apply to obscene materials showing minors</u>.

Against this backdrop, the defendant's reliance on *Stanley* fails at the threshold, because *Stanley* applies only to the in-home possession of obscene material *depicting adults*. This is the case for at least two reasons.

First, *Stanley* must be read "in the light of the facts of the case," *Armour & Co.* 323 U.S. at 133, which did not involve the possession (or production) of obscene depictions of children—real or AI-generated—or the welfare of children at all. As Georgia itself argued, the issue in *Stanley* was principally about the state's "right to protect the individual's mind from the effects of obscenity," which in effect involved the state's effort to "control[] a private person's thoughts." *Stanley*, 394 U.S. at 565-566. *Stanley* is therefore

best understood as limited to the question before the Court—whether adults have a First Amendment right to the in-home possession of obscene material depicting adults—and not to the materially different question whether such a right exists as to obscene and sexually explicit material depicting *children*. *See Stanley*, 394 U.S. at 560 (noting that prior cases did not "deal[] with the precise problem involved in the present case"). The difference between these questions is significant. As the Supreme Court made clear roughly 13 years after *Stanley*, the paramount importance of protecting minors from sexual exploitation entitles the government "to greater leeway in the regulation of pornographic depictions of children." *See Ferber*, 458 U.S. at 756-757. Extending *Stanley* to apply to obscene images of children therefore raises, and results in, precisely the kinds of problems associated with over-reading opinions that the Supreme Court has repeatedly warned against.[6] *Cf. Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373-374 (2023) ("emphasiz[ing]" that "opinions dispose of discrete cases and controversies and they must be read with a careful eye to context" (citing *Cohens*, 6 Wheat. 264 at 399-400)).

Second, and relatedly, the Supreme Court itself has characterized *Stanley* as applying only to obscene material "involving adults." *See United States v. Williams*, 553

---

[6] To be sure, a statute that uses the term "obscene materials" without specifying whether the materials show minors or adults might reasonably be read as applying to obscene materials depicting minors. But "'the language of an opinion is not always to be parsed as though we were dealing with language of a statute.'" *Nat'l Pork Producers*, 598 U.S. at 373 (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)); *see United States v. Ker Yang*, 799 F.3d 750, 755 (7th Cir. 2015) (discussing *Reiter* and noting need to avoid "attributing to the Supreme Court an imprudently wooden formalism with the language of its own opinions"). This principle, too, counsels strongly in favor of reading *Stanley* as being limited to obscene materials showing adults.

U.S. 285, 288-289 (2008) (*Stanley* held that the government "may not criminalize the mere possession of obscene material involving adults").[7] So have multiple federal courts of appeals. *See United States v. Morales-de Jesus*, 372 F.3d 6, 18 n.10 (1st Cir. 2004) (citing *Stanley* for the proposition that "the Supreme Court has held that states cannot regulate the private possession of adult obscenity"); *United States v. Vincent*, 167 F.3d 428, 431 (8th Cir. 1999) ("[*Stanley*] held states cannot criminalize possession of obscenity involving adults."); *United States v. Knox*, 32 F.3d 733, 750 (3d Cir. 1994) (distinguishing between "obscenity depicting adults" in *Stanley* and "child pornography"); *United States v. Kussmaul*, 987 F.2d 345, 350 n.5 (6th Cir. 1993) (describing *Stanley* as applying to "sexually explicit material featuring adults"); *United States v. Richardson*, 856 F.2d 644, 648 (4th Cir. 1988) ("In *Stanley*, the Court found that the first amendment protected private possession of obscene adult material in the home.").[8] Given the deference owed to legislation like § 1466A that is "aimed at protecting the physical and emotional well-being of youth," *Ferber*, 458 U.S. at 757, this Court, too, should decline to expand *Stanley* to insulate from prosecution the in-home possession of obscene images of minors being sexually abused.

          c.      <u>There are powerful child-safety reasons for limiting *Stanley* to material showing adults.</u>

As noted above, the Supreme Court in *Stanley* rejected Georgia's defense of its

---

[7] To be fair, in other instances the Court has described *Stanley* without the depicting-adults qualification. *See, e.g.*, *Reidel*, 402 U.S. at 354.

[8] While one court has recently stated that *Stanley* "protects the private possession in one's own home of obscene material depicting *virtual* minors, so long as no real children are victimized," *United States v. Ostrander*, 114 F.4th 1348, 1361 (11th Cir. 2024), that decision is neither controlling nor persuasive here for the reasons explained below. *See infra* at 26.

prohibition on possessing obscenity as necessary to protect the mind of the adult viewer of such material. *See supra* at 9-10. But that "paternalistic interest," *Osborne*, 495 U.S. at 109, is not at issue here. Instead, the need to criminalize the in-home possession and production of obscene materials depicting children is materially similar to the interests that the Supreme Court credited in *Osborne*, which held that there is no First Amendment right to possess child pornography, *Stanley* notwithstanding. *See generally id.* at 107-111 (defendant in *Osborne* was convicted of possessing child pornography in his home).

First, application of § 1466A to the in-home possession and production of obscene material showing children engaged in sexually explicit conduct advances the critical government interest in eradicating the market for materials showing the sexual exploitation of children. *See Osborne*, 495 U.S. at 109-111. That is, whereas the main justification offered by Georgia in *Stanley* involved protecting the adult possessor, the main justification here is protecting the physical, emotional, and psychological health of children. *Compare ibid.* Protecting children from such harms "easily passes muster under the First Amendment," and it is "surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand." *Id.* at 109-110. So too here: criminalizing the possession of obscene material depicting children is a critical tool in the government's effort to decrease the number of children who are victimized. And although *Stanley* rejected Georgia's argument on this general point, that "holding … must be viewed in light of the weak interests asserted by the State in that case." *Id.* at 110. In fact, "*Stanley* itself emphasized that [the Court] did not 'mean to express any opinion on statutes

making criminal possession of other types of printed, filmed, or recorded materials. … In such cases, compelling reasons may exist for overriding the right of the individual to possess those materials.'" *Id.* at 110 (quoting *Stanley*, 394 U.S. at 568 n.11).

Other related interests are also important here. Obscene depictions of children constitute a permanent record of the child's victimization and can harm those children in the future. *Compare Osborne*, 495 U.S. at 111. And there is reason to fear that offenders will use obscene imagery showing minors as a means to lure children into engaging in sexual activity. *Compare ibid.*

As the foregoing discussion illustrates, the application of § 1466A to the in-home possession and production of obscene material involving children is much more like *Osborne* than it is *Stanley*. And for the same reasons that the Supreme Court held in *Osborne* that neither the First Amendment nor *Stanley* provide any right to possess "child pornography," so should this Court hold that neither the First Amendment nor *Stanley* provide any right to possess obscene materials depicting children. *Cf. Ferber*, 458 U.S. at 757 ("[W]e have sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights.").

Of course, there is one important difference between the statute at issue in *Osborne* and § 1466A—the former applied only to material showing actual minors, whereas the latter contains no such requirement, *see* 18 U.S.C. § 1466A(c), and thereby by its terms reaches AI-generated material of the type the defendant created. But that difference is immaterial here, because the same concerns for the health and safety of real children that

the Supreme Court credited in *Osborne* and *Ferber* are also very much at stake here. *See generally Ferber*, 458 U.S. at 756-757 ("It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling." (internal quotation marks omitted)).

First, there is a real concern that offenders will use AI-generated obscene material depicting children in an effort to "groom" actual minors into engaging in sexual acts. *See United States v. Chambers*, 642 F.3d 588, 593 (7th Cir. 2011) ("Grooming refers to deliberate actions taken by a defendant to expose a child to sexual material; the ultimate goal of grooming is the formation of an emotional connection with the child and a reduction of the child's inhibitions to prepare the child for sexual activity."). Grooming is a long-standing and commonly employed technique that offenders use. *See ibid.*; *see also Osborne*, 495 U.S. at 111 ("[E]ncouraging the destruction of these materials is also desirable because evidence suggests that pedophiles use child pornography to seduce other children into sexual activity."). And the ability for offenders to use AI-generated imagery in furtherance of such an effort—for example, by generating such material and sharing it with a targeted minor—is clear. Criminalizing the in-home possession (and production) of AI-generated obscene material involving children is a critical tool to help prevent that grooming from taking place.[9]

---

[9] To be sure, in *Free Speech Coalition*, 535 U.S. at 251-253, the Supreme Court rejected a similar rationale for a ban on material that "appears to be" child pornography. The Court's rejection of this argument, however, turned on its initial finding that the law applied to non-obscene, First-Amendment-protected material, including productions of Romeo and Juliet and the film American Beauty. *Id.* at 247-248. In other words, the Court

Second, there is the ever-present concern that an offender's engagement with AI-generated obscene material depicting children will normalize the behavior and will, in turn, create increasing risk for actual children. *Cf. United States v. Jenkins*, 854 F.3d 181, 192 (2d Cir. 2017) ("It is undoubtedly correct that 'all child pornography offenses are extremely serious because they both perpetuate harm to victims and normalize and validate the sexual exploitation of children.'" (quoting U.S. Sentencing Comm'n, "Report to the Congress: Federal Child Pornography Offenses," at 311 (2012)) (USSC Report)); *see* USSC Report at 312 ("Non-production child pornography offenses normalize and validate the sexual exploitation of children, which contributes to the sexual abuse of new victims in at least three ways."). All of the same can be said for obscene material depicting children, and criminalizing the in-home possession of such AI-generated obscene imagery in this way helps to protect actual children. *Cf. Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 60-61 (1973) ("Although there is no conclusive proof of a connection between antisocial behavior and obscene material, the legislature of Georgia could quite reasonably determine that such a connection does or might exist," and "a legislature could legitimately act on such a conclusion … ."); PROTECT Act, Pub. L. 108-

---

explained, that law impermissibly relied on the "suppress[ion of] lawful speech as the means to suppress unlawful speech." *Id.* at 255. Section 1466A, on the other hand, applies only to depictions of minors engaged in sexually explicit conduct that are obscene under *Miller*, 413 U.S. at 24—material that is not protected by the First Amendment—and the reasoning in *Free Speech Coalition* is thus inapposite. *Cf. Hamling v. United States*, 418 U.S. 87, 115 (1974) (noting Court's "willingness to construe federal statutes dealing with obscenity to be limited to material such as that described in *Miller*"); *United States v. Buie*, 946 F.3d 443, 445-446 (8th Cir. 2019) (*Miller* framework applies to § 1466A's obscenity element); *United States v. Schales*, 546 F.3d 965, 971-972 (9th Cir. 2008) (same).

21, § 501(12), 117 Stat. 650 (2003) ("There is no evidence that the future development of easy and inexpensive means of computer generating realistic images of children would stop or even reduce the sexual abuse of real children or the practice of visually recording that abuse."); U.S. Sentencing Comm'n, "Federal Sentencing of Child Pornography Non-production Offenses," at 41-43 (2021) (discussing the link between possession offenses and related sex offenses). In this way too, applying § 1466A to the in-home possession of GenAI obscene imagery of minors may well help protect real children.

Third, the rapid developments in AI technology are making it increasingly difficult for individuals—*e.g.*, law enforcement, children—to know whether an obscene image depicts a real child or an AI-generated one, and there is reason to believe that the offender community is committed to generating such realistic-looking material.[10] *See, e.g.*, Internet Watch Foundation, "What has changed in the AI CSAM landscape," at 25 (July 2024) (90% of imagery reviewed "look like real images of children"); WeProtect Global Alliance, "AI-produced child sexual abuse material: Insights from Dark Web forum discussions" (Sept. 11, 2024) ("It was also clear that forum members are hopeful that AI will continue to quickly develop so that in the near future they won't be able to tell if a sexual image of a child is real or not."); *The Guardian*, "AI is overpowering efforts to catch child predators, experts warn" (July 18, 2024) ("Prosecutors and child safety groups working to combat crimes against children say AI-generated images have become so lifelike that in some cases it is difficult to determine whether real children have been

---

[10] In this case, the government has deduced from surrounding context that the defendant used AI to create the imagery. But much of the imagery itself is essentially photorealistic.

subjected to real harms for their production."). In any given case, therefore, expanding *Stanley* to protect the in-home possession (and production) of obscene imagery showing children creates the very real, very present risk that offenders engaged with material showing *actual* children will be immune from prosecution—a result that contradicts reason, *Osborne*, and clear congressional intent. *Cf.* PROTECT Act, Pub. L. 108-21, § 501(9)-(10), (13), 117 Stat. 650 (2003) (Congressional findings expressing concern that after *Free Speech Coalition*, and without § 1466A, offenders who victimize actual children may escape prosecution for lack of the government's ability to prove beyond a reasonable doubt that the victim was an actual child rather than a computer-generated one).

Finally, and relatedly, the photorealistic nature of GenAI material will adversely affect critical child-rescue efforts, as rescuers search for children who do not, in fact, exist. *See, e.g.*, Nat'l Center for Missing & Exploited Children, "Generative AI CSAM is CSAM" (Mar. 11, 2024) ("The creation and circulation of [AI-generated child sexual abuse material] is harmful and illegal. Even the images that do not depict a real child put a strain on law enforcement resources and impede identification of real child victims."); *The Guardian, supra* ("The volume of sexually explicit images of children being generated by predators using artificial intelligence is overwhelming law enforcement's capabilities to identify and rescue real-life victims, child safety experts warn."). In this way, too, the possession of AI-generated obscene material depicting children poses a direct threat to the safety of actual children.

These concerns are real, not merely notional, and this case largely shows why. The Instagram chats between the defendant and the minor to whom he sent the obscene

images show that after the minor said that he "just got home from school" and that he was 15 years old, the minor requested pictures of "[p]re teen so 12ish" boys in the woods; the defendant generated (among other images) three realistic-looking images of obviously minor boys graphically displaying their erect penises; and the defendant then sent those images to the minor.

There is more. In other of his direct messages on Instagram, the defendant discussed his sexual interest in prepubescent boys. An earlier investigation strongly indicated that the defendant was trying to download files of known child sexual abuse material, though no charges have been brought. And the state of Wisconsin is currently prosecuting the defendant for sexually abusing a prepubescent minor. *See* Dkt. 60-1. As this all shows, there is no clear line between those who offend with AI-generated imagery and those whose acts cause harm to real children.

Nor is any of this unique to the defendant. In *United States v. Yeasley*, for example, the defendant has been charged with possessing obscene material of a child — there, an AI-generated image of a baby performing oral sex on an adult man; the defendant is accused of possessing this image after having been previously convicted of accessing with intent to view child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B), which in turn involved material showing real children. *See* D. Idaho, No. 23-cr-273, Dkt. 16 (government memorandum in support of detention), Dkt. 25 (superseding indictment).

  d. <u>The conduct criminalized by § 1466A(b)(1) falls outside the extremely narrow scope of private conduct protected under *Stanley*.</u>

Setting aside the myriad ways in which the defendant's expansive reading of

*Stanley* runs afoul of other precedent, harms children targeted by offenders like himself, and disrupts law enforcement efforts to rescue victimized minors, his as-applied challenge to § 1466A(b)(1) also fails because here, unlike in *Stanley*, the only obscene material that he has been charged with possessing are images that have been shipped or transported in interstate or foreign commerce or were produced using materials that had been shipped or transported in interstate or foreign commerce. *See* Dkt. 2 at 2-3. In other words, he has not been charged with merely possessing obscene images in the privacy of his home; rather, he has been charged with possessing such images that have a connection to interstate commerce. *Id.* And as the Supreme Court has made clear since *Stanley*, the limited right to possess obscenity in the privacy of one's home cannot overcome "the power of Congress to exclude noxious articles from commerce." *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 376 (1971); *see also United States v. Handley*, 564 F.Supp.2d 996, 1001 (S.D. Iowa 2008) ("[W]hile an individual has a limited right to possess obscene materials in the privacy of his own home, there exists no right to receive or possess obscene materials that have been moved in interstate commerce[.]"); *United States v. Mees*, 2009 WL 1657420, at *4 (E.D. Mo. June 10, 2009) (rejecting *Stanley* challenge to § 1466A(b)(1) because it "does not make mere possession" a crime and instead "requires some connection to interstate commerce").

Unlike the law in *Stanley*, then, the law here reflects Congress's assessment that the defendant's possession of obscene images produced on his foreign-made laptop has a substantial effect on interstate commerce—that is, the market for obscene images of minors being sexually abused—and therefore necessarily exceeds the narrow bounds of

his home. *Compare Stanley*, 394 U.S. at 558 n.1 (quoting Georgia law), *with* 18 U.S.C. § 1466A(d); *see also* PROTECT Act, Pub. L. 108-21, § 501(15), 117 Stat. 650 (2003) ("Congressional action is necessary now to ensure that open and notorious trafficking in such materials does not reappear, and even increase, on the Internet."); *cf. United States v. Ramos*, 685 F.3d 120, 134 (2d Cir. 2012) (morphed child pornography created "alone in [a] trailer" using "personal family photos" that "never traveled across the internet" affects commerce). The Seventh Circuit adopted the same logic when it affirmed the constitutionality of 18 U.S.C. § 2252(a)(4)(B) as applied to the intrastate possession of child pornography in *United States v. Angle*, 234 F.3d 326 (7th Cir. 2000). There, the Court found it "unrealistic to think that pornographers will be content with their own supply" and reasoned that they will "likely wish to explore new or additional pornographic photographs of children," thereby "animat[ing the] demand for interstate pornography." *Id.* at 337 (quoting *United States v. Rodia*, 194 F.3d 465, 477 (3rd Cir.1999)). The Court further reasoned that barring the possession of child pornography—even privately in one's home—"will cause some of these child pornographers to leave the realm of child pornography completely, which in turn will reduce the interstate demand for" it. *Id.* at 337-338. Congress therefore "could have rationally believed that intrastate possession of child pornography bears a substantial relationship to interstate commerce." *Id.* at 338.

Those conclusions apply with equal force here. Indeed, after downloading Stable Diffusion to his computer and using the billions of images[11] culled from across the

---

[11] *See* Andy Baio, *Exploring 12 Million of the 2.3 Billion Images Used to Train Stable Diffusion's Image Generator*, Waxy (August 30, 2022).

internet in its dataset to create his own customized images of child sexual abuse, the defendant apparently tired of simply possessing this material and turned to social media, where he sent this content to a minor and cultivated a community of like-minded offenders so that they could trade similar content online. Extending *Stanley* to immunize the conduct at issue here would thus undermine the government's "legitimate interest in protecting the public commercial environment by preventing [obscene] material from entering the stream of commerce." *Orito*, 413 U.S. at 143.

> e.    Even if the Court disagrees with the above, the Court should still reject the defendant's argument that *Stanley* applies to the production of such obscene materials.

The defendant asserts (Dkt. 52 at 39-43) that *Stanley* not only protects his in-home right to *possess* obscene materials depicting children, but also his right to *produce* that material. For the reasons set forth above, *Stanley* offers no such protection. But even if this Court were to conclude otherwise with respect to the *possession* count, there is no basis in *Stanley* or anywhere else to insulate from prosecution a defendant's *production* of obscene material depicting minors.

*Stanley* itself is about in-home *possession* only. The defendant was convicted of possession, *Stanley*, 394 U.S. at 558-559; the parties agreed that the relevant question involved "possession of obscene matter," *id.* at 559; the defendant's argument in the Supreme Court related to the state's effort to criminalize the "mere private possession of obscene matter," *ibid.*; and the Supreme Court repeatedly couched its analysis in terms of possession and distinguished other cases on the ground that this case (*Stanley*) involved possession only, *ibid.* ("[W]e agree that the mere private possession of obscene matter

24

cannot constitutionally be made a crime."); *id.* at 568 ("We hold that the First and Fourteenth Amendments prohibit making mere private possession of obscene material a crime. … [T]he States retain broad power to regulate obscenity; that power simply does not extend to mere possession by the individual in the privacy of his own home.").

Nothing in the Court's opinion gives a defendant any right to *produce* obscene materials, even of adults, and even in one's own home. What the defendant here seeks, then, is not an application of *Stanley* but an extension of it. But that extension is unwarranted. Section 1466A requires the government to prove that the material is "obscene," and obscene speech is categorically unprotected speech under the First Amendment. Whatever the maximum possible reach of *Stanley*'s exception to that rule, it does not cover the production of obscene materials.

### C.    The defendant's arguments lack merit.

The defendant's *Stanley* argument revolves largely around his assertion that *Stanley* protects his in-home right to think, read, and satisfy his own intellectual and emotional needs, and that this right is "absolute." Dkt. 52 at 39-43. But this argument fails for at least two reasons. First, the Court in *Stanley* was responding to Georgia's primary defense of the statute, which, as noted above, rested on the need to protect the possessor/viewer; that interest is not at issue here. And second, whatever right *Stanley* confers, it is not "absolute"—after all, *Osborne* and *Ferber* make clear that there is no right to the in-home possession or production of child pornography. Indeed, not even the *Stanley* majority understood itself to be laying down an "absolute" rule that in the home, anything goes. *See Stanley*, 394 U.S. at 568 n.11.

The defendant's assertion that he has a "right to think freely—even thinking obscene thoughts," Dkt. 52 at 41, is true but irrelevant, because § 1466A does not criminalize thoughts. And the defendant's contention that his right to think freely necessarily protects his right to possess and produce obscene materials showing children is a non-sequitur. A person can, for example, think about child pornography without fear of prosecution, but he cannot possess or produce such material. The same goes for obscene material showing children.

Finally, the defendant's reliance on the Eleventh Circuit's decision in *United States v. Ostrander*, 114 F.4th 1348 (11th Cir. 2024), is misplaced. There, in rejecting an overbreadth challenge to § 1466A, the court stated that "the First Amendment protects the private possession in one's own home of obscene material depicting *virtual* minors, so long as no real children are victimized." *Id.* at 1361. But *Ostrander* did not involve in-home possession of obscene images of children; the defendant there possessed the material in a supermarket, and the issue on appeal involved an overbreadth challenge to § 1466A (which the Eleventh Circuit rejected). *Id.* at 1355-1356, 1359-1364. And in any event, the court's understanding is unpersuasive on the merits for all the reasons above.

* * *

Obscene speech is categorically unprotected. *Stanley* carved out a narrow exception to that rule and insulates from prosecution the in-home possession of obscene material depicting adults. This Court should reject the defendant's effort to expand *Stanley* to a circumstance that the *Stanley* Court did not face or address. Section 1466A is a critical tool in the government's effort to protect children, and its application here is

constitutional and should be sustained.

### III.    The Defendant's Motion to Dismiss Counts 2 and 3 Should Be Denied.

The defendant argues that Counts 2 and 3 of the indictment—which charge him with distributing obscene visual representations of the sexual abuse of children, in violation of 18 U.S.C. § 1466A(a)(1), and transferring obscene material to a minor, in violation of 18 U.S.C. § 1470, respectively—should be dismissed because the material at issue is not obscene. Dkt. 52 at 37-39. His argument lacks merit.

The Supreme Court, the Seventh Circuit, and other federal courts of appeals have all made clear that whether material is "obscene" under *Miller v. California* is a question for the factfinder to resolve. *Miller*, 413 U.S. at 24 (describing test as "basic guidelines for the trier of fact"); *United States v. Rogers*, 474 F. App'x 463, 468-470 (7th Cir. 2012) (unpublished) (describing questions of whether an image depicts sexual conduct and satisfies the *Miller* test as "question[s] of fact" for a jury to determine); *United States v. Langford*, 688 F.2d 1088, 1091 n.3 (7th Cir. 1982) ("If material falls within this category [of patently offensive sexual conduct], a trier of fact, applying the relevant community standards, would be permitted constitutionally, but not required, to find obscenity as a matter of fact." (internal quotation marks omitted)); *United States v. Ragsdale*, 426 F.3d 765, 771 (5th Cir. 2005); *United States v. Skinner*, 25 F.3d 1314, 1320 (6th Cir. 1994).

This is fatal to the defendant's argument, because a "motion to dismiss is not intended to be a summary trial of the evidence," *United States v. Yasak*, 884 F.2d 996, 1001 (7th Cir. 2009) (quotation marks omitted), or "a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence," *United States*

*v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009). "An indictment is legally sufficient if it (1) states all the elements of the crime charged; (2) adequately informs the defendant of the nature of the charges so that he may prepare a defense; and (3) allows the defendant to plead the judgment as a bar to any future prosecutions." *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010) (per curiam). Because the indictment here is facially valid—and the defendant does not contend otherwise—it cannot be dismissed on the theory that it is based on insufficient evidence. *See generally United States v. Williams*, 504 U.S. 36, 53-54 (1992); *White*, 610 F.3d at 958-959 ("In judging the sufficiency of this indictment, we do not consider whether any of the charges have been established by evidence or whether the government can ultimately prove its case. We only look to see if an offense is sufficiently charged, and on its face, this indictment adequately performs that function." (citations omitted)); *United States v. Guthrie*, 720 F. App'x 199, 201-203 (5th Cir. 2018) (per curiam) (unpublished) (affirming denial of motion to dismiss and explaining that "a reasonable fact-finder applying contemporary community standards could determine that the videos transmitted by Guthrie were 'patently offensive representation[s]' of masturbation or 'lewd exhibition of the genitals'"). As in *White*, the defendant's First Amendment concerns are "addressed by the requirement of proof beyond a reasonable doubt at trial, not by dismissal at the indictment stage." 610 F.3d at 959.

The defendant's arguments otherwise lack merit. Insofar as he maintains that images of minors with exposed penises—"flaccid, erect, or gripped"—are categorically non-obscene because they are not patently offensive, Dkt. 52 at 38, his argument is misplaced. As noted, the "patently offensive" prong of the *Miller* obscenity test is a fact-

bound question for resolution by the factfinder. *See, e.g., Ashcroft v. ACLU*, 535 U.S. 564, 576 n.7 (2002) ("[T]his Court has indicated that the 'patently offensive' prong of the test is also a question of fact to be decided by a jury applying contemporary community standards."); *Rogers*, 474 F. App'x at 470 ("Whether an image is 'patently offensive' is a question of fact" that "a jury evaluates."). The defendant's assertion that a court may "entertain motions that require it to answer only pure questions *of law*," Dkt. 52 at 38 (emphasis added), thus affords him no aid here.[12]

Further still, the defendant's argument that imagery of boys with erect penises is categorically non-obscene—that such images "simply are not (and cannot be) the stuff of the hard core, patently offensive type that falls outside the First Amendment and can be prosecuted," Dkt. 52 at 39—is inconsistent with the cases that have sustained obscenity convictions predicated on imagery showing erect penises. *See, e.g., Rogers*, 474 F. App'x at 466, 470 ("'[W]e conclude that the image Rogers emailed to Emily"—specifically, "a picture of an erect penis protruding out of a pair of unzipped pants being held by a hand"—"legally constitutes obscenity."); *United States v. Salcedo*, 924 F.3d 172, 178-179 (5th Cir. 2019) (affirming obscenity conviction premised on image of erect penis and noting that "no bright-line principle establishes that without more, an image of erect male

---

[12] It is perhaps possible that certain imagery—for example, a picture of an adult woman in a bathing suit swimming in the ocean—would be so obviously non-obscene that a district court could dismiss an obscenity count predicated on such an image. *Cf., e.g., Jenkins v. Nat'l R.R. Passenger Corp.*, 2008 WL 2520414, at *7 (N.D. Ill. 2008) ("existence of equitable estoppel is generally a question of fact" but "the determination can be a question of law … where the facts are undisputed and reasonable persons could not differ as to the inferences to be drawn from the facts presented") (internal quotation marks omitted)). The images at issue here do not implicate that scenario.

genitalia can never constitute a patently offensive, lewd exhibition of the genitals"); *United States v. Kokayi*, 2019 WL 2028517, at *8 (E.D. Va. 2019) ("Several circuits have held that a video of an adult male's erect penis or masturbating penis constitutes 'obscene material' under § 1470."). *Cf., e.g.*, *United States v. Hill*, 2010 WL 4365521, at *4 (W.D. Ky. 2010) (denying motion to dismiss obscenity count, which was predicated on argument that "as a matter of law, a naked, erect penis is not obscene," and explaining: "The Court agrees with the government that this is an issue of fact.").

Given all of this, it is perhaps unsurprising that the defendant has not cited a single case, from any jurisdiction, in which a court dismissed an obscenity count pre-trial based on the court's own determination that the material is not obscene. And the cases that the defendant does cite do not help him. In *New York v. P.J. Video, Inc.*, 475 U.S. 868 (1986), for example, the Court held that the traditional probable-cause framework applies to warrants to seize materials presumptively protected under the First Amendment, *id.* at 873-878; that decision is inapposite here. In *United States v. Risk*, 843 F.2d 1059 (7th Cir. 1988), the district court dismissed the indictment not because "the government could not prove its case" but instead because the indictment failed "to state a claim under the" applicable statute, *id.* at 1061; here, though, the defendant's claim is factual, notwithstanding his efforts to frame it otherwise. *See Jenkins v. Georgia*, 418 U.S. 153, 159 (1974) ("*Miller* states that the questions of what appeals to the 'prurient interest' and what is 'patently offensive' under the obscenity test which it formulates are 'essentially questions of fact.'"). In *United States v. Nitschke*, 843 F.Supp.2d 4 (D.D.C. 2011), an "unusual" case, the district court dismissed a count charging a violation of 18 U.S.C. §

2422(b), but the issue there was "whether the *undisputed facts* amount to an attempt to violate § 2422(b)," *id.* at 9 (emphasis added); here, in contrast, a key fact—whether the images that the defendant created are "patently offensive"—is highly disputed. Finally, the defendant says that the Supreme Court "made clear" in *Miller* that "the images must portray hard core, patently offensive sexual conduct" and that "whatever can be said about an exposed penis—flaccid, erect, or gripped—it ain't that," Dkt. 52 at 38; but in fact, *Miller* specifically included a "[p]atently offensive representation … of … lewd exhibition of the genitals" as a "plain example[]" of what can be properly deemed "patently offensive" under the three-part obscenity framework.  *Miller*, 413 U.S. at 25.

As the defendant notes elsewhere in his omnibus brief (*e.g.*, Dkt. 52 at 13), in *United States v. Arthur*, 51 F.4th 560 (5th Cir. 2022), the Fifth Circuit reversed one obscenity conviction after determining for itself that the image was not "patently offensive." *Id.* at 570-571. But the image at issue there—"a simple black and white pencil or charcoal drawing with minimal detail depicting an adolescent girl alone, reclining and apparently masturbating," *id.* at 570—differs meaningfully from the full-color, highly detailed, photorealistic images of the boys surrounded by other young children in the woods that the defendant created. Nothing about *Arthur* suggests that dismissal is warranted here, much less that an image of a child masturbating cannot ever be obscene. *See id.* at 570 n.6 (rejecting argument that "*any* drawing, fully fictional, of an adolescent masturbating constitutes felony obscenity" given "the fact-specific nature of the *Miller* test").

## IV.    The Defendant's Motion to Compel Should Be Denied.

The defendant next asserts that the grand jury must have been mis-instructed on

the law and asks the Court to order the government to produce the legal instructions that it gave the grand jury for *in camera* review. *See* Dkt. 42; *see also* Dkt. 52 at 43-47 (citing Fed. R. Crim. P. 6(e)(3)(E)(ii)). This claim, too, is meritless.

While grand jury proceedings are presumptively secret, Fed. R. Crim. P. 6(e), the Federal Rules of Criminal Procedure provide courts with discretion to disclose grand jury matters in certain limited circumstances, including "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). That does not mean, however, that a district court has the authority to review a grand jury's probable cause determination. To the contrary, the Supreme Court has made clear that the grand jury decides whether there is probable cause to believe that a defendant committed a crime "without any review, oversight, or second-guessing." *Kaley v. United States*, 571 U.S. 320, 328 (2014); *see also United States v. Schreiber*, 866 F.3d 776, 780-81 (7th Cir. 2017).

Yet that is what the defendant asks this Court to do. He seeks *in camera* review of the instructions given to the grand jury so that he can determine how it "found probable cause to believe that the images he allegedly possessed, produced, and distributed were obscene" and whether the evidence it considered "amount[s] to a federal crime." Dkt. 52 at 45-46. This request is foreclosed by Supreme Court precedent and should be denied.[13]

---

[13] District courts maintain limited supervisory authority to "enforc[e] or vindicat[e] legally compelled standards of prosecutorial conduct before the grand jury." *United States v. Williams*, 504 U.S. 36, 47 (1992); *see also United States v. Gillespie*, 974 F.2d 796, 801 (7th Cir. 1992) ("After *Williams,* then, nothing short of a violation of laws or procedural rules regulating grand jury matters will permit a court to exercise its supervisory authority in

To the extent that the Court is inclined to consider a request to second-guess the grand jury's probable cause determination as a basis to release grand-jury materials under Rule 6(e)(3)(E)(ii), the defendant has failed to demonstrate the "compelling necessity" or "particularized need" for the information he seeks. *Matter of Grand Jury Proceedings, Special Sept., 1986*, 942 F.2d 1195, 1198-99 (7th Cir. 1991). He does not identify any conflict in obscenity law that might have resulted in the grand jury being mis-instructed. Instead, he applies his own sanitized gloss to the images in this case— "an image of a juvenile's penis (in whatever state)," Dkt. 52 at 43—opines that no properly instructed grand juror could find them obscene, and asks the Court to figure out why the grand jurors disagreed with him. This sort of wishful speculation is insufficient to merit the relief he seeks. *United States v. Edelson*, 581 F.2d 1290, 1291 (7th Cir. 1979) (per curiam) (finding "unsupported speculation" without "point[ing] to anything in the record which might suggest that the prosecution engaged in improper conduct" insufficient to warrant disclosure of grand jury matters). Nor is it consistent with the evidence in this case. Far from just depicting "a juvenile's penis," the hyper-realistic images that the defendant distributed to a minor depict, among other things, a prepubescent-looking boy on his knees, grabbing at his large, exposed erection while a group of similarly young-looking children watch. The images found on his computer are no better: they depict, among other things, a roughly five-year-old girl sitting naked on a chair with her legs spread

---

the grand jury arena."). But the defendant's motion is grounded squarely in his belief that the grand jury should not have found probable cause to return an indictment, which does not implicate the conduct-related issues referenced in *Williams*.

wide apart and staring at the viewer as she pets a kitten; two naked pre-pubescent girls with pigtails kneeling between a nude adult's legs while one of the girls holds the adult's erect penis near her face; and a nude, prepubescent girl with a chain around her neck squatting over an adult who has his erect penis inserted into her vagina. It should come as no surprise that the grand jury returned an indictment here, and the Court should deny the defendant's motion to compel grand jury materials for *in camera* review.

## V.    The Defendant's Motions to Suppress and Request for a *Franks* Hearing Should Be Denied.

The defendant also argues that the warrants to search his Instagram accounts (the "Instagram Warrant," Dkt. 52-1) and home (the "Residential Warrant," Dkt. 52-2) should "be quashed and the evidence gathered pursuant to them [should] be suppressed." Dkt. 39. Specifically, he asserts that the warrants provided inadequate information for the issuing judge—Magistrate Judge Crocker—to determine whether two specified images described therein were obscene and that the Residential Warrant failed to tie the criminal conduct at issue to his home. Dkt. 52 at 27-37. He separately argues that he is entitled to a *Franks* hearing because both warrants' descriptions of the two images were materially and recklessly false. Dkt. 50. These arguments are meritless.

### A.    The warrants articulated probable cause for the searches.

The defendant spills much ink, *see* Dkt. 52 at 21-24, 27-35, suggesting that warrants authorizing searches for evidence of federal obscenity crimes should be subject to special rules. Not so. The Supreme Court has "never held that a magistrate must personally view allegedly obscene [material] prior to issuing a warrant authorizing [its] seizure." *P.J.*

*Video, Inc.*, 475 U.S. at 874, n.5; *see also United States v. Carroll*, 886 F.3d 1347, 1352 (11th Cir. 2018). To the contrary, just like in any child-pornography case, a "reasonably specific affidavit describing the content of a film generally provides an adequate basis for the magistrate to determine whether there is probable cause to believe that the film is obscene." *P.J. Video, Inc.*, 475 U.S. at 874 n.5. The Supreme Court has also explained that "an application for a warrant authorizing the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally." *Id.* at 875; *see also United States v. Levinson*, 991 F.2d 508, 509-10 (9th Cir. 1993). And all that standard asks is whether "there is a fair probability that … evidence of a crime will be found in particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Both warrants satisfy that standard here.

a. <u>The Instagram Warrant articulated probable cause.</u>

Starting first with the Instagram Warrant, *see* Dkt. 52-1 at 7-15, the supporting affidavit set forth the following facts for Magistrate Judge Crocker:

- In October 2023, Meta sent two CyberTips to NCMEC reporting the user of an Instagram account who distributed what appeared to be GenAI images of nude children to a minor.

- According to the CyberTips, the user of the offending account had also posted GenAI images of semi-nude minors in bondage attire and was following another user who was looking to "meet on telegram and talk about young boy addiction !!"

- The CyberTips included parts of the conversation between the user and the minor from September and October 2023. The minor describes being "15" and expresses an interest in the user's images. The user describes how he generates these images with Stable Diffusion and says that he has been "banned" from Telegram and had his posts "flagged." Stable Diffusion, the affidavit explains, is an AI model that allows users to create realistic images or alter existing images based on user-created text prompts.

The user then asks if the minor wants "a custom set," and the minor asks for images of "[b]oys in the woods" who are "[p]re teen so 12ish[.]"

- On or about October 7, 2023, the user sends the minor several images that were flagged as "apparent [child sexual abuse material]," which the warrant describes as two computer-generated images of different prepubescent boys. In one, a minor is kneeling on a blanket in the woods in his underwear. His erect penis is exposed and is the focal point of the image, with "pre or young pubescent children" in the background. In the second, a minor is leaning back on his hands on a blanket in the woods with his legs spread apart to expose his erect penis, which is the focal point of the image. A minor female is kneeling next to the boy and looking at him.[14]

- The CyberTips identified only two accounts that were linked to this account: the defendant's personal Facebook page and a similarly named Instagram account belonging to a purported 14-year-old. The phone number for the purported 14-year-old's account matches the defendant's phone number and had been flagged in an older CyberTip as receiving potential child pornography in November 2022.

- The CyberTips identified an IP address used to access the reported account multiple times in October 2023. Law enforcement determined that this IP address was owned by Charter Communications and sent a subpoena for information about the subscriber who was utilizing the IP address in the same timeframe. Charter identified the subscriber as the defendant, the subscriber's address as the defendant's address, and the subscriber's phone number as the defendant's number.

- Law enforcement identified the minor described in the Instagram chat above and confirmed that this individual was, in fact, 15 years old.

- In 2020, law enforcement searched the defendant's home based on evidence that someone using his internet was attempting to download child pornography over a peer-to-peer network. The defendant admitted to using this peer-to-peer network. A forensic examination of his devices uncovered artifacts related to files called "11yo jacks off cums with sound.wmv" and "NEW2009_9yboycum.wmv," among others.

These facts provided ample probable cause to search the defendant's Instagram account. Probable cause "is not a high bar." *Moorer v. Chicago*, 92 F.4th 715, 720 (7th Cir.

---

[14] The defendant asserts that the descriptions in the warrant are "the verbatim recitation of the CyberTip." Dkt. 52 at 28. That is incorrect. A law enforcement agent prepared these descriptions after reviewing the images.

2024). It exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place" based on a totality of the circumstances. *Gates*, 462 U.S. at 238. And when assessing whether a warrant establishes probable cause, a magistrate judge must make "a practical, common-sense decision," focusing on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *United States v. Carroll*, 750 F.3d 700, 703 (7th Cir. 2014) (internal citations and quotation marks omitted). "[D]eference is owed to the issuing judge's conclusion that there is probable cause," and such a determination should not be disturbed "if there is substantial evidence in the record that supports his decision." *Id.* (internal citations and quotation marks omitted).

Applying these principles here, Magistrate Judge Crocker plainly had a substantial basis to issue the Instagram Warrant. The warrant allowed him to reasonably conclude that: the defendant used this Instagram account to post images of semi-nude minors in sexualized bondage attire; he posted more explicit images that had been "flagged" and gotten him "banned" from Telegram; he followed another user who wanted to talk about "young boy addiction" on Telegram; he created and sent at least two images of prepubescent minors exposing their erect penises in front of other children to a 15-year-old who wanted images of "[p]re teen" boys; and he engaged in similar child-pornography-related conduct just a few years prior. The most reasonable conclusion to draw from these facts is that the defendant created the two obscene images because he is sexually attracted to children, he used this Instagram account to explore his attraction and seek out others who share it, and he sent these two images to a 15-year-old to sexually

entice that minor. There was also no way to determine, at least at this earlier stage, whether the images that he distributed were purely AI-generated images of virtual minors or partially AI-generated child pornography that he created using the faces of real children. *See* 18 U.S.C. § 2256(8)(C) (defining "child pornography" as a "visual depiction [that] has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct"). The affidavit thus linked criminal activity to the defendant's account—at a minimum, transporting obscene material and transferring obscene material to a minor, in violation of §§ 1462(a) and 1470, respectively, but also possessing, distributing, and producing obscene visual representations of the sexual abuse of children, in violation of § 1466A, and distributing and possessing child pornography, in violation of § 2252A—and established a "fair probability" that evidence of that conduct would be found in the account.

The defendant's arguments to the contrary do not pass muster. While he asserts that the descriptions of the obscene images in the affidavit "just don't cut it," Dkt. 52 at 29, he identifies no case in which similarly detailed and non-conclusory descriptions of obscene material were deemed inadequate to establish probable cause. In fact, the Supreme Court has found that less descriptive and more conclusory summaries of adult pornography were sufficient to allow a magistrate judge to "focus searchingly" on whether the material was obscene. *See P.J. Video, Inc.*, 475 U.S. at 874-79 (approving affidavits briefly describing hours-long videos as showing "fondling and cunnilingus," "intercourse," and "fellatio"); *cf. Lee Art Theatre, Inc. v. Virginia*, 392 U.S. 636, 637 (1968) (reversing conviction where films were seized based on affidavit stating "only the titles

of the motion pictures and that the officer had determined from personal observation of them and of the billboard in front of the theatre that the films were obscene").

The defendant's related efforts to analogize the descriptions of the obscene images in the Instagram Warrant to his own descriptions of paintings and photographs that have been edited using GenAI, *see* Dkt. 52 at 30-35, likewise miss the mark. Setting aside that neither law enforcement nor Magistrate Judge Crocker could rule out that the images in this case were morphed child pornography depicting real minors,[15] none of the edited artwork conjured up in his motion depicts prepubescent minors graphically displaying their erect penises to other young and prepubescent children. More to the point, the defendant's single-minded focus on the warrant's written description of the images misses the forest for the trees. The warrant did not describe the images in a vacuum. As discussed above, it provided substantial information about the defendant, his prior interactions with law enforcement, and his broader activity on Instagram. Based on a common-sense view of this evidence, Magistrate Judge Crocker could reasonably find it fairly likely—if not most likely—that (1) the defendant's conduct was motivated by, and the images he created and distributed to a 15-year-old were intended to appeal to, a

---

[15] The defendant's argument here exposes the fundamental flaw with his view of obscenity law. It is easy to imagine a scenario in which an offender takes an innocent image of a minor friend or relative, uses Stable Diffusion to stylize the image and add a lasciviously exposed erection to the minor's body, and then distributes that image to another minor. *See, e.g.,* Kyle Jones, *Over 100 images of child porn found on McFarland man's Dropbox account, complaint alleges*, Fox47 (Oct. 5, 2023). Under the defendant's reading of obscenity and child-pornography laws, the government would be powerless to obtain the legal process needed to investigate this conduct unless law enforcement had proof that the minor in the image is real. That cannot be the case.

prurient sexual interest in minor boys, *see Rogers*, 474 F. App'x at 468-69 (defining a "prurient interest in sex" as one "that is shameful or morbid," including a "desire to expose" a 13-year-old to an erection); (2) these images are "patently offensive" because they capture minors lewdly displaying their erect penises to other minors, *id.* at 470 (finding an image of an "erect penis" patently offensive); and (3) the images lack any "serious" value because the defendant sent them to sexually entice a 15-year-old and not to "engage [this minor] in scientific discussion on human anatomy or an academic discourse on teenage sexual activity," *id.* Accordingly, the defendant's challenge to the Instagram Warrant is without merit.[16]

> b.    The Residential Warrant was supported by probable cause.

The defendant's challenge to the Residential Warrant fails, too. This warrant contained all the same facts to establish probable cause as the Instagram Warrant and more. *See* Dkt. 52-2 at 36-47. In addition to the facts set out above, *supra* at 35-36, the Residential Warrant conveyed the following to Magistrate Judge Crocker:

- Law enforcement obtained the contents of the Instagram account used to send obscene material to a 15-year-old. A review of this material revealed that the

---

[16] The defendant also cites *Arthur*, 51 F.4th at 570, and *Spinar v. United States*, 440 F.2d 1241 (8th Cir. 1971), to argue that the images he sent are not obscene. *See* Dkt. 52 at 29. Those cases address whether the government had proven *beyond a reasonable doubt at trial* that unrelated images were obscene and are therefore inapposite to Magistrate Judge Crocker's probable-cause assessment. In any event, as explained *supra* at 31, the images at issue here materially differ from the images in those cases. And with respect to *Arthur*, 51 F.4th at 570, the fact that both a jury and a district-court judge viewed an image that is far more innocuous than the images at issue here and found it obscene beyond a reasonable doubt, *see id.* (describing a "simple black and white pencil or charcoal drawing with minimal detail depicting an adolescent girl alone reclining and apparently masturbating"), only bolsters the conclusion that there was a "fair probability" that criminal conduct had occurred here.

defendant sent a third obscene image, which depicts three prepubescent boys wearing minimal clothing in the woods. The boy on the left has his erect penis exposed, the boy on the right has his penis exposed, and the boy in the middle appears to be gripping the penis of the boy on the right.

- The defendant used this account to engage in a conversation with another minor, also in or around October 2023. The defendant told this minor that he likes "looking at" prepubescent boys and generally expressed a sexual interest in minors.

- In another direct-message conversation, a user sent the defendant two videos unprompted. The videos appear to depict a pubescent male exposing his penis and masturbating, and the defendant responds, "Thanks, I guess?"

- In other conversations, the defendant discussed trafficking in GenAI images of minors on Telegram and creating "sexier" images by running Stable Diffusion locally.

- The defendant and his cars were observed at his home in Holmen, Wisconsin, which is the same home that law enforcement searched in 2020 in connection with a child-pornography investigation and that Charter identified as the address for the subscriber who used the IP address reported by Meta.

Accordingly, and for all the reasons described above, the Residential Warrant established a "fair probability" that criminal conduct had occurred—namely, violations of 18 U.S.C. §§ 1462(a), 1466A, 1470, and 2252A—and that evidence of these crimes would be found in the defendant's home.

But the analysis does not end there. The defendant also argues that the Residential Warrant failed to tie any criminal conduct to his home because it (1) identifies a specific IP address that was used to log into the account on October 1 and send obscene images on October 7, but (2) identifies the defendant's home as the residence assigned that IP address on October 2 and 8. Dkt. 52 at 35-37; *see also* Dkt. 52-2 at 30. Because this IP address might have been assigned to a different subscriber from day to day, the defendant argues, the Residential Warrant did not establish probable cause to search his

home. Dkt. 52 at 37. This argument fails for at least two reasons.

First, the IP address was not the only evidence tying this conduct to the defendant's home. As the warrant explained, the Instagram account that was used to send obscene images to a 15-year-old was linked by "device and/or IP address to" the defendant's Facebook account—registered using his name, phone number, and email address—and another similarly named Instagram account that was also registered under his phone number. Dkt. 52-2 at 42. And as the warrant also explained, NCMEC received a CyberTip in November 2022 reporting that this similarly named Instagram account had received potential child pornography. In other words, whoever sent obscene images to a minor over Instagram in October 2023 did so using the same mobile device or internet connection that had been used to access the defendant's personal Facebook account and another account linked to the defendant that had reportedly received child pornography less than a year prior. And just two years prior to that, the defendant had been the subject of yet another child-pornography investigation. Given the warrant's explanation that individuals who have an interest in "visual depictions of minors engaged in sexually explicit conduct … almost always possess and maintain copies of [this material] in the privacy and security of their home," Dkt. 52-2 at 33, it was imminently reasonable for Magistrate Judge Crocker to conclude that this characteristic applies to the defendant, that he was the person engaging in all the conduct described in the warrant, and that he was therefore likely doing so from his home in Holmen, Wisconsin.

Second, the defendant's suggestion that Charter Communications might have assigned an IP address to one subscriber, switched it to the defendant, switched it back

to the first subscriber, and then switched it back to the defendant again, all over the course of a week, strains credulity. Add to this theory that the other subscriber was apparently using an Instagram account that is only linked to two other accounts, both registered under the defendant's phone number and one with a very similar username, and it becomes nonsensical. While "dynamic" IP addresses of course exist, *see* Dkt. 52 at 35, the defendant provides no evidence that a single IP address could be assigned in this specific pattern over the course of just a few days. Nor was the government required "to rule out every innocent explanation for probable cause to be established." *United States v. Jackson*, 103 F.4th 483, 488 (7th Cir. 2024). Given all the information above, Magistrate Judge Crocker was amply justified in making the common-sense determination that a fair probability exists that the Instagram account in question was used by the defendant and that evidence of his criminal conduct would be found in his home.

### B.     The defendant is not entitled to a *Franks* hearing.

The defendant also asserts that he is entitled to a *Franks* hearing to challenge the veracity of both warrants because their descriptions of the minors in the two obscene images[17] discussed above as "prepubescent" was both materially and recklessly false. Dkt. 50; *see also* Dkt. 52-1 at 19 (Instagram Warrant), Dkt. 52-2 at 40-41 (Residential Warrant). He is mistaken on all fronts.

While "[a]n affidavit supporting a search warrant is presumed valid," *United States*

---

[17] The Residential Warrant describes a third image that the defendant distributed to a minor via Instagram. Dkt. 52-2 at 34. The defendant does not challenge the veracity of the description of this image and the United States therefore does not address it here.

*v. Taylor*, 63 F.4th 637, 649 (7th Cir. 2023), the Supreme Court carved out a narrow exception to this rule in *Franks v. Delaware*, 438 U.S. 154 (1978). Under *Franks*, a defendant is entitled to "an evidentiary hearing regarding the veracity of information included in a search warrant application[] if he can make a substantial preliminary showing that: (1) the warrant affidavit contained false statements, (2) these false statements were made … with reckless disregard for the truth, and (3) the false statements were material to the finding of probable cause." *United States v. Mullins*, 803 F.3d 858, 861-62 (7th Cir. 2015). But "[t]he presumption of validity is not easy to overcome." *Taylor*, 63 F.4th at 650. To obtain a *Franks* hearing, a defendant must make specific "allegations of … reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171. "Reckless disregard for the truth" means that "the officer entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that he or she knew would negate probable cause." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (quotation marks omitted).

The defendant has not cleared the threshold required for a *Franks* hearing here. To start, he has not made a substantial preliminary showing that the descriptions of the naked minors in the two specified images as "prepubescent" is false.[18] He asserts otherwise based on what he perceives to be the minors' "highly defined muscles" and "body and pubic hair," but he also concedes that the minors' faces look "*very* young"—a "bit younger" even than "early tweens"—and that they are "very slender." Dkt. 50 at 1,

---

[18] The defendant refers to these descriptions as "copied-and-pasted from what Instagram provided law enforcement." Dkt. 50 at 7. Again, that is not accurate. *See supra* at 36 n.14.

3. And while he chalks this up to the "hodgepodge of parts" belonging to real-life minors depicted in the billions of images used to train Stable Diffusion,[19] *id.* at 3, his claim that this renders the warrants false is misplaced. To be sure, any image of a prepubescent minor with a visible erection is likely to appear incongruous, though the government disagrees with the defendant's broader assertion that these images do not depict prepubescent boys. But even granting as true his claim that the minors in these images have other features that are incompatible with prepubescence, it is undisputed that the defendant was asked to create images of "[p]re teen" boys and then delivered images that depict minors with extremely slender physiques and "*very* young" faces that appear prepubescent. Given the circumstances, it is both accurate and reasonable to characterize the minors in these images as prepubescent. Indeed, if the defendant was asked to create an image of a baby and then sent an image of an infant with an erect penis and possible pubic hair, that image could still accurately be characterized as depicting an infant. And since law enforcement had no way of knowing when applying for the warrants whether the minors' faces in these images were GenAI amalgamations or adapted by the defendant from images of real children, it made good sense to defer to the age of the "identifiable" faces when describing what the images depicted. *See* 18 U.S.C. § 2256(8)(C).

Second, assuming that the descriptions of these two minors were false, the defendant cannot show that they were made with reckless disregard for the truth. On this

---

[19] It is worth noting that the original dataset of images on which Stable Diffusion was trained—where this "hodgepodge of parts" came from—apparently contained suspected child pornography. *See* Samantha Cole, *Largest Dataset Powering AI Images Removed After Discovery of Child Sexual Abuse Material*, 404 Media (Dec. 20, 2023, 7:00 AM).

point, he asserts that the "bizarre" nature of this case means that any "misrepresent[ation of] the image's content," inadvertent or not, demonstrates a reckless disregard for the truth. Dkt. 50 at 7. But that is not the standard. *See supra* at 44. And, again, the defendant was asked to create images of "[p]re teen" boys and did, in fact, create images of boys with faces that both parties agree match that descriptor. That the agent then described these images as depicting "prepubescent" minors, while still noting that the minors had notable erections and that the images appeared to be AI- and computer-generated, does not establish that the agent here "entertained serious doubts as to the truth" of these descriptions or "had obvious reasons to doubt their accuracy." *Betker*, 692 F.3d at 860.

Third, and most fundamentally, the asserted falsities were immaterial to Magistrate Judge Crocker's probable-cause finding. Focusing solely on the Instagram Warrant,[20] it asserted that there was probable cause to believe that evidence of violations of 18 U.S.C. §§ 1462(a), 1466A, 1470, and 2252A would be found in the defendant's account. Dkt. 52-1 at 8. For purposes of §§ 1462(a) and 1470, there is no requirement that these obscene images depict a minor. And § 1466A requires only that the images depict a "minor," not a prepubescent minor. It is therefore immaterial whether the warrant described the images that the defendant sent to the 15-year-old as depicting "prepubescent" minors with erections; "pubescent" minors with erections; or, as the defendant would seemingly prefer, age-indeterminate minors with "*very* young" faces, "highly defined muscles," and erections. Dkt. 50 at 1. In any of these scenarios, the

---

[20] As detailed above, the Residential Warrant contains more even more facts in support of Magistrate Judge Crocker's probable-cause determination.

defendant still transmitted computer-generated images to a 15-year-old that depict minors with "*very* young"—or prepubescent—faces displaying visible erections to other minors who, the defendant does not dispute, are "pre or young pubescent children." *See* Dkt. 50 at 3, 5. Indeed, the defendant ignores this latter aspect of the images entirely. The images do not simply show a "male with his penis exposed"—rather, they depict young boys exposing their visible erections to *other prepubescent children*. What is more, he sent these obscene images to a minor using an Instagram account dedicated to sharing images of semi-nude minors in BDSM attire. And setting aside the obscenity statutes, the warrant likewise provided reason to believe that the prepubescent faces in these images might depict real minors who had been modified by the defendant to be lewdly displaying erect penises using Stable Diffusion—that is, child pornography. 18 U.S.C. § 2256(8)(C).

In short, the warrants provided ample reason to conclude that there was a "fair probability" that contraband and other evidence would be found in the defendant's Instagram account and home, regardless of how they described the minors depicted in the two challenged images. *See Rogers*, 474 F. App'x at 468-70 (affirming conviction where defendant sent an image of an *adult's* erection to an undercover officer pretending to be a 13-year-old girl). Accordingly, the Court should deny his request for a *Franks* hearing.

### C.    The good faith exception applies.

Finally, even if there was insufficient probable cause to issue the warrants in this case, the good-faith exception from *United States v. Leon*, 468 U.S. 897 (1984), exempts the recovered evidence from suppression. Under the good-faith exception, "evidence seized pursuant to a subsequently invalidated search warrant need not be suppressed if the

officers relied in good faith on the magistrate judge's issuance of the warrant," with "[a]n officer's decision to obtain a warrant" serving as "*prima facie* evidence that he or she was acting in good faith." *United States v. Otero*, 495 F.3d 393, 398 (7th Cir. 2007). A defendant can rebut the presumption of good faith if he can show that "(1) the judge issuing the warrant abandoned his detached and neutral role; (2) the officer was dishonest or reckless in preparing the affidavit; or (3) the warrant was so lacking in probable cause that the officer's belief in its existence was entirely unreasonable." *United States v. Woodfork*, 999 F.3d 511, 519 (7th Cir. 2021) (internal quotation marks omitted). But "[o]vercoming the presumption of good faith is no small feat, as an officer cannot ordinarily be expected to question a judge's probable cause determination." *Id.* (internal quotation marks omitted).

Here, the defendant cannot rebut the presumption of good faith. As explained above, the agent who described the challenged images endeavored to do so accurately—certainly not recklessly—by providing a neutral, non-conclusory description of what they depict, along with all the relevant context known at the time. As a result, the warrants contained lengthy factual recitations in support of probable cause, both of which point to the defendant having used an anonymous Instagram account to create and send images of prepubescent minors exposing their erect penises to young children to a 15-year-old. The defendant presents no evidence that Magistrate Judge Crocker abandoned his detached and neutral role when reviewing these affidavits, nor is there any evidence that the warrants were so obviously deficient that it was unreasonable for law enforcement to rely on them. In short, the warrants were obtained and relied upon in good faith, and the defendant's motions to suppress should be denied.

## VI.     The Defendant's Motion to Obtain Copies of the Alleged Obscene Material Should Be Denied.

The defendant argues that he is entitled to copies of the alleged obscene material at issue in this prosecution—including photorealistic images of minors engaging in sexually explicit acts (*e.g.*, oral sex, sexual intercourse) and lasciviously exhibiting their genitals. Dkt. 51.  The Court should deny the motion.

### A.     Under 18 U.S.C. § 3509(m), the alleged obscene material is not subject to copy, reproduction, or provision to the defendant.

Under 18 U.S.C. § 3509(m)(1), during "any criminal proceeding, any property or material that constitutes child pornography" as defined in 18 U.S.C. § 2256 "shall remain in the care, custody, and control of either the Government or the court." Section 3509(m)(2)(A), in turn, provides that "[n]otwithstanding" Federal Rule of Criminal Procedure 16, "a court shall deny, in any criminal proceeding, any request by the defendant to copy, photograph, duplicate, or otherwise reproduce any property or material that constitutes child pornography" as defined in § 2256, "so long as the Government makes the property or material reasonably available to the defendant." "[P]roperty or material shall be deemed to be reasonably available to the defendant if the government provides ample opportunity for inspection, viewing, and examination at a Government facility of the property or material by the defendant," his counsel, and a person whom he may seek to qualify as an expert witness at trial. 18 U.S.C. § 3509(m)(2)(B).

As noted above, the protections set forth in 18 U.S.C. § 3509(m) apply to "child pornography" as defined in § 2256. As most relevant here, § 2256(8)(B) defines "child

pornography" to include "any visual depiction, including any … computer-generated image or picture, whether made or produced by electronic … means … of sexually explicit conduct," where "such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8)(B). "Indistinguishable" means "virtually indistinguishable, in that the depiction is such that an ordinary person viewing the depiction would conclude that the depiction is of an actual minor engaged in sexually explicit conduct." *Id.* § 2256(11). And "[s]exually explicit conduct," in turn, means (among other things) "graphic sexual intercourse, including genital-genital" and "oral-genital"; "lascivious simulated sexual intercourse where the genitals, breast, or public area of any person is exhibited"; and "graphic or simulated lascivious exhibition of the anus, genitals, or pubic area of any person." *Id.* § 2256(2)(B); *see id.* § 2256(10) (defining "graphic" to "mean[] that a viewer can observe any part of the genitals or pubic area of any depicted person … during any part of the time that the sexually explicit conduct is being depicted").

The obscene images at issue in this prosecution constitute "child pornography" under Section 2256(8)(B). *See supra* at 33-34 (describing images). Accordingly, under § 3509(m), the defendant and his counsel are entitled to a reasonable opportunity to inspect, view, and examine the imagery at a government facility, but they are not entitled to copy, reproduce, or otherwise possess that imagery.[21] *See generally, e.g., United States v.*

---

[21] The government has already made the obscene material at issue in this case available

*Shrake*, 515 F.3d 743, 744-746 (7th Cir. 2008).

In arguing otherwise, the defendant maintains only that the images at issue in this case are "obvious[ly] … not real minors," such that the imagery does not constitute "child pornography." Dkt. 51 at 2-3. But the imagery speaks for itself, and that imagery falls within the definition of "child pornography" set forth in § 2256(8)(B).  And to the extent the defendant suggests in passing that he has a Fifth Amendment right to copies of the obscene material, *see* Dkt. 51 at 3, he is mistaken.  *Cf. Shrake*, 515 F.3d at 744-746 (rejecting Fifth Amendment challenge, among other challenges, to § 3509(m)).

**B.    In any event, the imagery is contraband, and the defendant and his counsel are therefore not entitled to reproduce or possess it.**

Alternatively, the defendant is not entitled to copies of the alleged obscene materials because they are contraband. The imagery here is obscene under the three-part *Miller* standard, *see supra* at 7, 29-31, 39-40, and as a result, it is categorically unprotected under the First Amendment. Because these images are obscene and depict minors engaged in sexually explicit acts, they are illegal to produce, distribute, receive, possess with intent to distribute, or possess. *See, e.g.*, 18 U.S.C. §§ 1466A, 1470. Indeed, and as this Court has recognized, even before the enactment of § 3509(m), courts had determined that it was reasonable for the government to refuse a defendant's request to copy child pornography on the ground that the materials are illegal contraband. *United States v. Kimbrough*, 69 F.3d 723, 731 (5th Cir. 1995) ("Child pornography is illegal contraband. We

---

for the inspection of the defendant and his counsel at a government facility in Madison and it will continue to do so throughout the pendency of this case.

decline to find that Rule 16 provides such contraband can be distributed to, or copied by, the defense." (internal citation omitted)); *United States v. Horn*, 187 F.3d 781, 792 (8th Cir. 1999); *see also Shrake*, 515 F.3d at 746 (favorably citing *Kimbrough* and *Horn*).

Moreover, although Federal Rule of Criminal Procedure 16(a)(1)(E) obligates the government, upon a defendant's request, to "permit the defendant to inspect and to copy or photograph" certain items in certain circumstances, Rule 16(d)(1) vests district courts with the authority, "for good cause," to "deny, restrict, or defer discovery or inspection, or grant other appropriate relief." Congress, in enacting § 3509(m), reasonably recognized the special risks that would result from defendants being allowed to reproduce or possess sexually explicit imagery of children. *See Shrake*, 515 F.3d at 746 ("[T]he assertion that § 3509(m) lacks a rational basis is unfathomable. Possession of child pornography is a crime. Congress is entitled to reduce the number of copies in circulation of material that a grand jury had found, by a preponderance of the evidence, to constitute child pornography."); *United States v. Johnson*, 456 F.Supp.2d 1016, 1019 (N.D. Iowa 2006) ("[T]he manifest purpose of § 3509(m) is to prevent the unnecessary distribution of child pornography used in connection with criminal trials. … Congress adopted a reasonable measure to ensure that the child pornography used in criminal trials does not escape into the public domain."). This case calls for the Court to exercise this Rule 16(d)(1) authority and to deny the defendant's motion to copy the allegedly obscene materials he created. *See Shrake*, 515 F.3d at 746 (citing *Kimbrough* and *Horn*, noting that in both cases the courts of appeals "had suggested that district courts use their discretion in managing discovery under Rule 16 to prevent duplication of these materials," and further noting that "[t]he

judges who proposed this approach had not taken leave of their senses").

     **C.**     **The defendant will not be prejudiced by the Court's denial of his motion.**

As noted above, § 3509(m)(2) requires the government to provide the defendant and his counsel "ample opportunity for inspection, viewing, and examination" of the imagery "at a Government facility." The government has twice already made this material available for defense counsel's inspection at a government facility less than half a mile from the courthouse in Madison and it will continue to do so. The defendant himself is on pre-trial release living in Wisconsin, such that he, too, has already and will readily be able to again view the imagery in the government facility if he wishes. If the defendant seeks to have an anticipated expert witness review the material, the government will discharge its obligation to provide that individual too with the requisite "ample opportunity" to inspect, view, and examine the imagery.

**VII.**    **The Defendant Is Not Entitled to a Bill of Particulars, but the Government Will Provide One.**

Finally, the defendant moves to compel the government to produce a bill of particulars specifying which images it will argue are obscene and are the basis for Counts 1 and 4. Dkt. 52 at 48-49. Although the government does not believe that a bill of particulars is required, *see generally United States v. Vaughn*, 722 F.3d 918, 926 (7th Cir. 2013) ("[A] bill of particulars is unnecessary where the indictment sets forth the elements of the charged offenses and provides sufficient notice of the charges to enable the defendant to prepare his defense." (internal quotation marks omitted)), the

government—which has already provided similar information with respect to Counts 2 and 3—agrees generally to provide such information as to Counts 1 and 4.

Specifically, the government will undertake its best efforts to identify for the defendant the images that are obscene and that are relevant to Counts 1 and 4. The government's accession in this respect, however, does not constitute a commitment that the government will necessarily seek to introduce all of these images into evidence at trial. Nor, given the considerable number images that the defendant produced, should the government's accession be understood as limiting the government's trial presentation only to those images initially identified for the defendant. Rather, if the government determines that it may want to introduce additional obscene imagery into evidence at trial beyond that which was initially identified, the government will provide prompt notice of as much to defense counsel.

Dated this 13th day of December, 2024.

Respectfully submitted,

STEVEN J. GROCKI
Chief, Child Exploitation & Obscenity Section

By:

/s/ *William G. Clayman*
William G. Clayman
Trial Attorney

Ross B. Goldman
Trial Attorney